FILED

2020 Nov-13  PM 04:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF ALABAMA

#### WESTERN DIVISION

TERRI MCGUIRE-MOLLICA
    Plaintiff

7:20-CV-1768-RDP-SGC

v.

THE FEDERAL BUREAU OF PRISONS;  THE UNITED STATES OF AMERICA;
    PATRICIA V. BRADLEY, OUTGOING WARDEN at FCI/SPC Aliceville in Official and Individual Capacity;
    CHAD GARRETT, INCOMING WARDEN at FCI/SPC Aliceville in Official and Individual Capacity;
    ADMINISTRATOR SHOULDERS, SPC Aliceville in Official and Individual Capacity;
    CASE MANAGER MEDLEY, SPC Aliceville in Official and Individual Capacity;
    MAIL ROOM STAFF JOHN/JANE DOE (currently unknown), SPC Aliceville each in Official and Individual
    Capacities;
    MEDICAL AND HEALTHCARE STAFF JOHN/JANE DOE (currently unknown), SPC Aliceville each in Official
    and Individual Capacities, et al.;

    Defendants

---

## MOTION FOR RELIEF UNDER THE

### FEDERAL TORTS CLAIM ACT TITLE 28 sections 2671-80, 1346 and

### TITLE 42 U.S.C. sections 1983, 1985, and 1988 and BIVENS

---

COMES NOW, Terri McGuire-Mollica, pro se litigant, unskilled and unschooled in the law, asking this

Honorable Court for Relief under the Federal Torts Claim Act ("FTCA") Title 28 U.S.C. sections 2671-80 and

1346(b); for violations under Title 42 U.S.C. sections 1983, 1985, and 1988 and Bivens v. Six Unknown Agents

of the Federal Bureau of Narcotics ("Bivens"); and, violations of the Constitution of the United States

Amendments 1, 4, 5, 6, 8, and 14.

Additionally, the United States of America, through the Federal Bureau of Prisons ("FBoP") and its

officials, is also in violation of the treaty of the United Nations Congress on the Prevention of Crime and the

Treatment of Offenders, held in Geneva 1955, approved 1957, and revised and reapproved on May 22, 2015,

also known as "the Nelson Mandela Rules".

The FBoP and the Satellite Prison Camp ("SPC") at the Federal Correctional Institution ("FCI") at Aliceville, Alabama, has violated her constitutional rights by denying her due process rights to access to medical and health services and access to the court system. These acts were injurious and detrimental and caused great harm to her and her health.

I.  Summary

The Plaintiff asserts the following claims:

-  that the Federal Bureau of Prisons policies have caused her constitutional harm and subjected her to Deprivation of Rights under Title 42 U.S.C. sections 1983, 1985, 1988, and Bivens;

-  that the Aliceville, Alabama, prison staff, as a result of the FBoP Policies, have placed her life in danger, so grievous bodily harm could be inflicted;

-  plaintiff has a serious medical need that has been deliberately ignored by the FBoP and SPC Aliceville prison staff;

-  on 3/10/2020, the World Health Organization ("WHO") declared the coronavirus a worldwide pandemic;

-  in response to the pandemic, on 3/13/2020 the White House declared a National Emergency under section 319 of the Public Health Service Act Title 42 U.S.C. section 247(d) (see www.WhiteHouse.gov);

-  there is a COVID-19 virus pandemic and because the Plaintiff has a untreated uterine, cervical, and ovarian tumors, a blood disorder causing uncontrolled bleeding, obesity (BMI > 25), hypertension, and a former smoker the Center for Disease Control has determined that she is at a higher risk to contract the virus and experience severe complications or even death. (see www.CDC.gov, updated 7/19/2020 and 10/08/2020). he FBoP and SPC officials have refused to follow the CDC guidelines to prevent the spread of the COVID-19 virus at Plaintiff's place of confinement. This deliberate indifference is in violation of her Constitutional Rights and the United Nations Geneva treaty, entered into by the United States in 1955 and reapproved in 2015;

-  due to the current health crisis and pandemic, coupled with the unsanitary conditions of confinement at the Aliceville, Alabama prison, and her untreated medical conditions, she is facing a death sentence;

-  the Aliceville officers/staff have intentionally tampered with Plaintiff's incoming and outgoing Legal Mail, thus denying her access to the Courts, in violation of her Constitutional Rights.

II.    Standards

Pursuant to the United States Constitution, Plaintiff is entitled to be provided Medical Services under the "Cruel and Unusual Punishment" Clause of the Eighth Amendment. Also, under that Amendment, the FBoP is obligated to keep prisoner free from harm while incarcerated. Pursuant to Title 18, U.S.C. section 4042(c)(2), the FBoP is required to provide adequate and suitable living quarters for safekeeping and subsistence of all persons charged with or convicted of an offense against the United States. Deliberate Indifference to Petitioner's life and liberty establishes a "Due Process" violation under the Fourteenth Amendment. The U.S. Constitution also guarantees all of its citizens access to the court system. Intentionally withholding and tampering with legal mail and refusing to send legal documents to the courts establishes violations under the First, Fourth, Fifth and Sixth Amendments.

According to the 1955 United Nations Geneva Congress on the Prevention of Crime and the Treatment of Offenders, the United Nations sets Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules) so that: (1) Prisoners should enjoy the same standards of health care that are available in the community and should have access to necessary health-care services free of charge without discrimination on the grounds of their legal status; (2) all prisons shall ensure prompt access to medical attention in urgent cases. Prisoners who require specialized treatment or surgery shall be transferred to specialized institutions or to civil hospitals; and (3) clinical decisions may only be taken by the responsible health-care professional and may not be overruled or ignored by non-medical prison staff. (see Exhibit A)

Under the Federal Torts Claims Act, the United States government has consented to be sued for "personal injury or death cause by the negligent or wrongful act of omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the Untied States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." (Title 28 U.S.C. section 1346 and Tisdale v. United States, 62 F.3d 1367, 1370-71 (11th Cir. 1995)). The FTCA only applies to "persons acting on behalf of a federal agency in an official capacity." (Means v. United States, 176 F.3d 1376, 1379 (11th cir. 1999), citing 28 U.S.C. section 2671).

Under Title 42 U.S.C section 1983 and Bivens v. Six Unknown Agents of the Bureau of Narcotics, 403 U.S. 1388, 91 S.Ct. 1999, 29 L.Ed.22 619 (1971), a plausible claim under section 1983 must allege "(1) a violation of a constitutional right; and (2) the alleged violation was committed by a person acting under the color of state law or a private individual who conspired with state actors." (Melton v. Abston, 841 F.3d 1207,

1220 (11th Cir. 2016)). And to state a claim under Bivens, a plaintiff must allege facts showing a violation of her constitutional rights committed by a Federal Government official "through the officials' own individual actions..." (Stevens v. Osuna, 877 F.3d 1293, 1309 (11th Cir. 2017)). An Eighth Amendment claim for violation of deliberate indifference to a medical need is cognizable under Bivens. (Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)).

III. Argument

A. Withholding Medical and Health Services ( > Four Years)

The FBoP and Satellite Prison Camp ("SPC") at Federal Correctional Institution ("FCI") at Aliceville, Alabama, through its Federal Government officials in their individual and official capacities, have violated her Eighth Amendment and other constitutional rights, by denying her access to healthcare services for a serious medical need and acting with deliberate indifference, through their own individual actions. The officials "intentionally withheld medical treatment for non-medical reasons" (Hill v. Dekalb Regional Youth Detention Center, 40, F.3d 1191 (11th Cir. 1994)) and deliberately denied or delayed access to medical care for a serious medical condition.

A prisoner claiming she is deprived of medical care in violation of the Eighth Amendment must show "(1) a serious medical need; (2) the defendants deliberate indifference to that need; and (3) causation between that indifference and plaintiff's injury." Danley v. Allen, 540 F.3d 1298, 1310 (11th Cir. 2008)

(1) Serious Medical Need

"A serious medical need is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the need for a doctor's attention." (Farrow v. West, 320 f.3d 12343 (11th Cir. 2003)). Any type of growth on the uterus, cervix or ovaries are particularly suspect to be a cancer. In addition, transabdominal mesh is the object of at least 7 Multi-district Level class action lawsuits in the Southern District of West Virginia (see American Medical System Product Liability Litigation MDL 2325; Boston Scientific Corp PLL MDL 2326; etc.), which has affected more than 75,000 individuals and has been known and advertised by the media for almost a decade. Even a lay person understands the seriousness of the transabdominal implants and the resulting injuries and death.

Plaintiff can show that she sufferes from a serious medical need that has been left untreated by the FBoP and Aliceville, as follows:

(a) The Plaintiff arrived at the Federal Correctional Institute at Aliceville in late September

2016. She was diagnosed on 10/20/2016 with am 8 cm uterine tumor (exacerbated by transabdominal mesh), uncontrollable bleeding, and severe anemia requiring a blood transfusion. (see Exhibit B-1)

(b)     The on-staff doctor (Griffin) requested on outside consultation and Plaintiff was taken to see Dr. Ted Cox on 5/04/2017. The tumor diagnosis was confirmed and it had grown to approximately 11 cm. The doctor recommended a consult with a surgeon specializing in transabdominal mesh. Biopsy performed but Aliceville did NOT request the results. Dr. Cox also recommended surgery. (see Exhibit B-2) Seven of the nine pages of Medical Records from Dr. Cox have been removed from Plaintiff's FBoP medical records.

(c)     From the period 5/05/2017 - 12/18/2019, the Medical Staff requested two (2) additional ultrasounds of the tumor, which showed the tumor increasing in size as well as other cysts/tumors forming. Those ultrasounds were performed as follows: (1) 3/13/2018, results showing the tumor had grown to 13 cm; also showing was two 5 cm ovarian cysts and a habothian growth on the cervix (see Exhibit B-3). (2) 12/18/2019, results showing the uterus was extended to 20 cm and the tumor had estimated weight of 15 lbs. (see Exhibit B-4)

(d)     On 8/26/2019, via Sick-Call, Plaintiff specifically requested to have tumors treated. (see Exhibit B-5)

(e)     Plaintiff started the administrative remedy process on 10/31/2019 (see Section IV)

(f)     Plaintiff requested a Compassionate Release from Warden Bradley on 2/05/2020. (see Exhibit C)

(g)     5/14/2020 Sick Call Request - No Response (see Exhibit B-6)

(h)     6/15/2020 Sick Call Request - No Response (see Exhibit B-7)

(i)   Plaintiff was featured in the June 2020 issue of Reason's Magazine article, "These Women Received a Death Sentence by Getting Sick in Prison." (www.Reason.com) (see Exhibit D @ page 7)

(j)   On 7/09/2020, 9 days after the magazine article was published and 11 months after the sick call request (see item "d" above), Plaintiff was taken on an outside medical trip to Dr. Autery at Walker Women's Center. The gynecologist again reconfirmed the same diagnoses, and recommended the same treatment as Dr. Cox had on 5/04/2017, except now instead of laparoscopic surgery to remove the tumor, a hysterectomy is required due to the increased size of the tumor.

According to Dr. Autery's notes (see Exhibit B-10) she follow-up up with the medical staff at Aliceville after receiving the results of the biopsies and recommended a treatment schedule. There is no notation of a follow-up in Plaintiff's FBoP medical records and 12 page (of 22 pages total) of Dr. Autery's medical notes are missing from Plaintiff's FBoP medical chart.   (see Section III(B)(2) and Exhibit B-9)

(k)   7/28/2020 Sick Call Request - No Response to Plaintiff but noted in medical records (see Section 2(c) below and Exhibit B-8)

(i)   As of the date of this filing, approximately 90 days after the outside gynecologist visit, NONE of the doctor's recommendations have been implemented, including access to the new prescriptions. (see Exhibit E-3)

A Petitioner may also show a serious medical need by proving that "a delay in treating the need worsened the condition." See Mann v. Taser International Inc. 588 F.3d 1306-07 (11th Cir. 2009). The 4-year delay in obtaining treatment has caused the in uterine tumor to grow in size from less than 8 cm to over 13 cm; increase the size of the uterus to over 21 cm (roughly the size of a 6-month pregnancy); caused growths on the cervix and ovaries; and, pushed the abdominal mesh through the walls of the abdomen and pelvis, causing visible hernias.

"An objectively serious medical need" is one so grave that "if left unattended, [it] poses a substantial risk of serious harm." Taylor v. Adams, 721 F.3d 1258 (11th Cir. 2000). There is now a substantial risk of cancer and it has spread to other organs; the transabdominal mesh is pushing through the muscle walls, likely to

cause a rupture; and the chronic anemia is not being controlled with medication. These effects, along with uncontrolled bleeding causing chronic anemia, have placed Plaintiff in the "high-risk" category for serious complications and even death from the COVID-19 virus. (www.CDC.gov)

When Plaintiff was first diagnosed with the tumor in October 2016, it was < 8 cm in size and could have been removed laproscopically. Because of the lack of medical treatment, the tumor is now > 21 cm and weighs approximately 15 lbs; a hysterectomy is now being recommended.

2. Deliberate Indifference

Deliberate Indifference has three components: (1) subjective knowledge of a risk of harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence. (Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003)).

a. Knowledge of Risk of Harm

The staff at Aliceville is clearly aware of Plaintiff's medical needs through medical records, the diagnosis of her condition by prison staff doctor Griffin; outside consultation with two gynecologists; four ultrasounds, prescriptions for treating medical conditions, compassionate release to the Warden, and administrative remedy process. (see Exhibits B, C and section IV)

b. Disregard of that Risk

The staff at Aliceville prison acted with disregard to Plaintiff's medical issues by ignoring the prescribed medical procedures and medications by the two outside physicians.

Although the medical staff requested ultrasounds and other consultations, the current prison staff doctor never even charted the results in her medical records.

The medical staff refused to fill the prescriptions from outside physician Autery that would have alleviated some of the symptoms. (see Exhibit E-3)

The medical staff at Aliceville intentionally interfered with treatment once prescribed by Drs. Cox and Autery. A delay of treatment for obvious serious condition can result in a constitutional violation where "it is apparent that the delay would detrimentally exacerbate the medical problem and the delay is medically unjustified." ( Hill 40 F.3d 1176, 1187-89 (11th Cir. 1994)).

c. Conduct is More Than Negligent

The staff at Aliceville prison has a history of lying to the Courts and falsifying medical records of inmates. Per U.S. District Court Judge Eagles at Beck v. United States 1:13-cr-186-6 US Dist LEXIS 108542, 2019 WL 2716505 (MD NC 6/28/2019) @ footnote 15 "describing an error on declaration of a FBoP physician assistant who stated Ms. Beck had a surgery consolation scheduled before the end of May [2019], which the court relied on in crafting TRO but which true out NOT TO BE TRUE."

The medical staff at Aliceville has falsified Plaintiff's medical records as follows:

- After Plaintiff's 5/4/2017 appointment with outside physician Cox, the staff deleted approximately 5 pages of the medical records that contained the results of the pathology reports and his recommendations to consult with transabdominal mesh specialist and surgery;

- The medical staff falsified Plaintiff's medical records to include a "denial of medical services on 11/27/2018, which does not show any information about an appointment and a FORGED signature for Plaintiff;

- The medical records from Plaintiff's outside medical consultation with Dr. Autery

- On 8/11/2020, the medical staff created an "Administrative Note 1" stating "Inmate refused to go out on several occasions" without any documentation. The note also states that Plaintiff was "scheduled for MLP" visit on 8/25/2020; however, that visit never occurred. (see Exhibit E-2)

The medical staff at Aliceville intentionally interfered with treatment once prescribed by Drs. Cox and Autery. A delay of treatment for obvious serious condition can result in a constitutional violation where "it is apparent that delay would detrimentally exacerbate the medical problem and the delay is medically unjustified." (Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187-89 (11th Cir. 1994)). The medical treatment is so grossly incompetent, inadequate, or excessive as to shock the conscience to fundamental fairness.

U.S. District Court Judge Catherine Eagles, in granting a compassionate release to a former SPC Aliceville inmate, wrote "the indifference to [her] medical treatment" and "improper treatment for medical conditions" [provided by SPC Aliceville] constitute extraordinary and compelling reasons to be granted release." United States v. Beck 1:13-cr-186-6 U.S. Dist LEXIS 108542, 2019 WL 2716505 (MD NC 6/28/2019).

B. Tampering with Mail

1.  Legal Mail

The staff at the SPC/FCI Aliceville has been tampering with inmate mail since May 2020. As of this date of the filing, the mail room is "at least 3 weeks behind in handing out mail" (per Aliceville officer Haywood). Plaintiff has been denied access to her legal mail, which in turn is violating her constitutional right of access to the courts. (See Affidavit at Exhibit H).

The Warden has been made aware of this problem but has not rectified the situation as of the date of this filing. (see Exhibit H-3).

2.  Medical Records

The physician from Plaintiff's 7/09/2020 medical consultation, Dr. Autery, sent 22 pages of medical records to the prison to be included in Plaintiff's FBoP medical chart. Only 10 pages of the 22 are in the record. Plaintiff sent a request on 8/25/2020 and asked that the records be sent directly to her at the SPC Aliceville. Per the physician, the records were mailed on 9/02/2020 but never received by Plaintiff. (see Affidavit and Exhibit H).

C.   Deliberate Indifference to COVID-19 Pandemic

Per the CDC, the COVID-19 virus is spread mainly from person to person and between people who are in close contact with one another through respiratory droplets when an infected person coughs or sneezes. The droplet can land in mouth or noses of people within about 6 feet of infected persons. (Corona virus 2019 How It Spreads 3/4/2020 at www.CDC.gov)

The Federal Bureau of Prisons and the Wardens at Aliceville have allowed the officers and staff to circumvent the CDC guidelines as well of "FBoP's Comprehensive Plan" and Alabama's Mandatory Mask Order by:

a.   Between 8/20/2020 - 10/22/2020, officers/staff Daniels, Duncan, Fountain, Maughn, Murphy, Summerville, Wilder, and others have entered the housing units at least 65 times without wearing face masks, in clear violation of CDC guidelines, even though Alabama has a MANDATORY face mask order;

b.   Between 5/29/2020 - 10/08/2020, 13 inmates have been taken on outside medical trips to physician offices and hospitals, and have been allowed to immediately return to the housing unties without temperature checks or quarantine;

c.   Aliceville is releasing transferred inmates and self-surrenders into general population that have tested positive for the virus without retesting because "you cannot get the virus twice" (per Aliceville medical staff);

d.   Medical staff and SPC/FCI Aliceville are into wearing PPE when examining inmates because "the virus is not airborne" (per Aliceville medical staff);

e.   On 8/24/2020, two inmates were taken from the virus-free camp environment to quarantine at the FCI. Less than 14 days later, they both tested POSITIVE for the virus because they were housed with new arrivals that had already tested positive for the virus;

f.   On 10/03/2020, the FBoP and Aliceville reinstated in-person visitation with no testing or quarantine for inmates receiving outside visits;

g.   From 3/30/2020 - present, cleaning supplies provided do not contain alcohol or bleach, the only 2 known agents to kill the virus;

h.   From 3/30/2020 - present, inmates have only been provided 3 disposable face masks and 3 reusable

ones (that do not meet the CDC guidelines);

 i. From 3/30/2020 - present, inmates at the camp have only had their temperatures taken twice (4/21 and 4/24/2020)

IV. Administrative Remedies

"Even when [administrative] exhaustion is seemingly mandated by decisional law, the requirement is not absolute." A court may waive an administrative exhaustion requirement "where [exhaustion] would be futile...where the administrative process would be incapable of granting relief...or where pursuing agency review would subject [the persons seeking relief] to undue prejudice." (Washington v. Barr, 925 F.3d 109, 118 (2nd Cir. 2019)) Further, where delay results in health consequences, "can justify waiving an administrative exhaustion requirement for any of those three reasons (id at 120-21). This includes situation where "the relief the agency might provide could, because of undue delay, become inadequate." (id at 119-20).

A district court in ruling on a motion is not required to disregard documents that the plaintiff himself filed with his original complaint. (Gross v. White, 340 F. Appx 527, 534 (11th Cir. 2009)).

A. 90 days after asking for treatment for her tumors on 8/26/2019 (see Exhibit B-4) and not receiving any, Plaintiff began the Administrative Remedy Process by filing as follows:

 - form 8.5 filed on 10/31/2019; returned on 12/03/2020 because medical took no action (see Exhibit F-1);

 - form 9 filed on 12/04/2019; response due 1/01/2020 but not received until 6/23/2020 (see Exhibits F-2.1-4);

 - form 10 filed on 8/01/2020 (due to delay in receiving the form from Aliceville staff); sent certified #7019 1640 0000 8596 2244 and signed for on 8/17/2020 - See Exhibit F-3); response due on 9/06/2020; no response as as this filing.

 - form 11 filed on 10/01/2020; sent certified #7020 0640 0000 8156 3341; response due on 10/31/2020 but no response.

The FBoP Administrative Remedy Process should take approximately 90 days, start to finish. Plaintiff filed the 8.5 on 10/31/2019, and as of this date, a year later the process is still not completed.

B. Federal Torts Claim Act

Petitioner filed the appropriate "Claim for Damage, Injury, or Death" form with the SE Regional Office of the FBoP on 8/01/2020, tracking #9590 9402 5405 9189 0421 64. No response as of this date. (see Exhibit G-1)

C. Petitioner asks this court to waive all administrative exhaustion requirements because the FBoP and Aliceville refuses to make those remedies available to her and has consciously tried to thwart the use of the administrative remedy process, as follows:

a. her form 9 at the Warden/Prison level was supposed to be answered on or before 1/01/2020; it was answered on 6/23/2020; the form 10 was due back from the FBoP SE Regional Office on 9/04/2020 but received no response. The FBoP does not follow its own procedures in handling the administrative remedy process;

b. the staff at Aliceville refuses to supply inmates with the appropriate forms in that Plaintiff, along with other inmates was relocated from the SPC to the FCI during the period 4/28 - 8/20/2020 due to the COVID-19 virus and did not have access to her Counselor or Case Manager for weeks; therefore, the form 10 for the SE Regional Office was not available timely;

c. the staff is tampering with the incoming and outgoing mail, so Petitioner cannot guarantee that the mail she sent to the Regional FBoP office or the Attorney General's office has been received nor can she determine when or if any responses were sent back to her. (see Section III and Affidavit at Exhibit H)

Plaintiff is only required to use the processes made available to her by the FBoP and Aliceville. The Supreme Court has explained that the ordinary meaning of "available" is 'capable of use for the accomplishment of a purpose." (Booth v. Churner, 532 U.S. 731, 737, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). The Supreme Court identified three examples of circumstance "in which an administrative remedy, although officially on the books is not capable of use to obtain relief: (1) when the procedure operates as a simple dead end; (2) when the procedure is so opaque that it becomes, practically speaking, incapable of use; and (3) when prison administrators thwart the use of the procedure through machination, misrepresentations, or intimidation."

VII. Conclusion and Relief

Wherefore the Petitioner respectfully requests that this Honorable Court award judgment in favor of Petitioner for violation of Petitioner's rights under the Federal Torts Claims Act (Title 28, sections 2671-80 and 1346), Title 18 U.S.C. sections 1981, 1983, 1985, and Bivens, the United Nations Congress Act (1957, 2015) and under statutory and constitutional laws of the United States and award Petitioner the following:

A.    Actual and consequential damages as may be proven, plus interest;

B.    Compensatory damages to compensate for the pain, suffering, and harm to Petitioner as a result of Defendants illegal actions;

C.    Compensatory damages to reimburse Petitioner all costs associated with needed medical care;

D.    Punitive damages to Petitioner in an amount to properly penalize Defendants for their misconduct and to deter such wrong doing in the future;

E.    Exemplary damages;

F.    Attorney fees;

G.    Trial of all issues of fact by a jury;

H.    Allow Petitioner to amend complaint should she be retaliated against for this court filing;

I.    Grant Petitioner such other and further relief as the court sees fit.

Respectfully submitted this the 27th day of October 2020.

Terri McGuire-Mollica

Terri McGuire-Mollica
Reg. No. 31860-001
c/o SPC Aliceville
P.O. Box 487
Aliceville, AL  35442

Please Serve the Following:

Federal Bureau of Prisons
South Central Regional Office
346 Marine Forces Drive
Grand Prairie, TX  75051

CERTIFICATE OF SERVICE

I, Terri McGuire-Mollica, certify under penalty of perjury that a true and correct copy
of this MOTION FOR RELIEF UNDER THE FEDERAL TORT CLAIMS ACT and APPLICATION TO
PROCEED IN FORMA PAUPERIS was served on the U.S. District Court for the Northern District of
Alabama, Huntsville, AL, via first class prepaid U.S. Mail, by placing it in the SPC Aliceville prison
mail box on this, the 27th day of October 2020.

Terri McGuire-Mollica
Reg No. 31860-001

Exhibit A

PARC National Prisoner Resource Directory – December 2018

Selected excerpts from the UNITED NATIONS STANDARD MINIMUM RULES FOR THE TREATMENT OF PRISONERS (the Nelson Mandela Rules)

United Nations Congress on the Prevention of Crime and the Treatment of Offenders, held at Geneva 1955, approved 1957. Revised and adopted on May 22, 2015, as 122 individual rules, renamed the "Nelson Mandela Rules." (Full set of all 122 Mandela Rules is 40 pages; available at www.penalreform.org/wp-content/uploads/2015/05/MANDELA-RULES.pdf. According to letters from our readers, the UN will not send free copies.)

**Basic Principles**

All prisoners shall be treated with the respect due to their inherent dignity and value as human beings. No prisoner shall be subjected to, and all shall be protected from, torture and other cruel, inhuman or degrading treatment or punishment, for which no circumstances whatsoever may be invoked as a justification.

Every prison shall have a library for the use of all categories of prisoners, adequately stocked with both recreational and instructional books...

Exhibit B -1

**Bureau of Prisons**
**Health Services**
**Health Problems**

Reg #: 31860-001                     Inmate Name:  MOLLICA, TERRI MCGUIRE

| Description | Axis | Code Type | Code | Diag. Date Status | Status Date |
|---|---|---|---|---|---|
| **Current** ||||||
| Iron deficiency anemia<br>10/20/2016 14:16 EST  Griffin, Richard MD/CD | | ICD-10 | D509 | 10/20/2016 Current | |
| Anemia, unspecified<br>10/14/2016 16:33 EST  Wordlaw, Lease NP | | ICD-10 | D649 | 10/14/2016 Current | |
| Hyperlipidemia, unspecified<br>11/25/2019 14:29 EST  Horton, Shanquail CRNP | | ICD-10 | E785 | 11/25/2019 Current | |
| Opioid Use Disorder: Moderate<br>10/15/2018 09:18 ES  De Jesus, Gabriel PsyD | I | DSM-IV | F11. | 10/15/2018 Current | |
| Anxiety disorder<br>10/11/2016 11:41 EST  Wordlaw, Lease NP | | ICD-10 | F419 | 10/11/2016 Current | |
| Mental disorder, not otherwise specified<br>10/11/2016 11:41 EST  Wordlaw, Lease NP | | ICD-10 | F99 | 10/11/2016 Current | |
| Migraine<br>10/24/2016 15:52 EST  Griffin, Richard MD/CD | | ICD-10 | G43909 | 10/24/2016 Current | |
| Myopia<br>11/27/2017 10:03 EST  Coshatt, Randy S Optometrist | | ICD-10 | H5210 | 11/27/2017 Current | |
| Essential (primary) hypertension<br>07/11/2019 09:00 EST  Williamson, Jim CRNP | | ICD-10 | I10 | 07/11/2019 Current | |
| Dental caries on smooth surface penetrating into pulp<br>04/10/2017 11:17 EST  Lockhart, J. DMD | | ICD-10 | K0263 | 04/10/2017 Current | |
| Disorder of teeth and supporting structures, unspecified<br>02/26/2019 12:16 EST  Lockhart, J. DMD | | ICD-10 | K089 | 02/26/2019 Current | |
| Noninflammatory disorder of uterus, unspecified<br>10/20/2016 14:37 EST  Griffin, Richard MD/CD<br>leiomyomatous, uterus 16 weeks | | ICD-10 | N859 | 10/20/2016 Current | |
| Abnormal uterine and vaginal bleeding, unspecified | | | | | |

Generated 08/20/2020 07:32 by Farrior, Jamie HIT          Bureau of Prisons - ALI                                    Page 1 of 2

Reg #: 31860-001                     Inmate Name:  MOLLICA, TERRI MCGUIRE

| Description | Axis | Code Type | Code | Diag. Date Status | Status Date |
|---|---|---|---|---|---|
| 10/20/2016 14:16 EST  Griffin, Richard MD/CD | | ICD-10 | N939 | 10/20/2016 Current | |
| Abnormal results of function studies of organs and systems<br>06/19/2018 16:22 EST  Griffin, Richard MD/CD<br>mammogram additional view 5.2018 BIRADS 0 | | ICD-10 | R948 | 06/19/2018 Current | |
| Encounter for exam for admission to prison without abnormal findings<br>10/11/2016 11:41 EST  Wordlaw, Lease NP | | ICD-10 | Z022 | 10/11/2016 Current | |

Total: 15

Histo... ar        Report

MOLLICA, TERRI MCGUIRE - 6073

*31860-001*

**FCI Aliceville**

**GYN Exam**

Patient: ...O...    TE... ...CGUIRE    **MRN: 8073**    **FIN: 55893**
Age: 50 ea...    ...ale  DOB: 5/14/1966
Associated Di... ...    one
Author: Cox

Subjec... ...
Chi... ...om
UT f ... ...    ... (05/04/17 10:54 by Weatherly, Brandle).

History of .    ...: 50 Y white female Para 3003 LMP 4/4/17 here for AUB and Uterine Fibroids

History of ; rec...    ...0-year-old white female para 3003 LMP 4/4/2017 has been referred from Aliceville prison for evaluation of uterine fibroids
and abnormal u    ...ng resulting in anemia. Patient admits to a very long history of uterine fibroids with her last hemoglobin being 6.4.

Health ...
Pro...
f
        ...D CT FF88A870-2C00-4C77-8112-D3320B346FF4 / Confirmed
        ...emia / SNOMED CT 145104011 / Confirmed
        ...rgic / SNOMED CT 742C916E-A628-4582-9804-4DFF423BB6EF / Confirmed

All...
        ...elected)
        ...cumented
        (No reactions were documented)
        ...cin (No reactions were documented)
        ...x (No reactions were documented)

Med...
        ...ions

        ...5 mg ), 0 Refill(s), Type: Maintenance
        ...50 mg ), 0 Refill(s), Type: Maintenance

Histori...
Pas...
        ...70-2C00-4C77-8112-D3320B346FF4)
        ...emia (145104011)
        ...s (742C916E-A628-4582-9804-4DFF423BB6EF)

Proce...
        F...    ...93829010).
        1    ...8).
        ...    ..)...

Fam...
        ...

Soc...    ...ems have been recorded.

Gyne...
Me...
Cy...
Flo...

Objecti...
Vital ...
        CDT        Peripheral Pulse Rate        70 bpm
                    Systolic Blood Pressure        140 mmHg

Printe...        , Ted                                                Page 1 of 2
Printe...        ../ 8:48 AM CDT                                      (Continued)

β-5

## Federal Correctional Institution

## SPC Aliceville

### Sick Call Request/Triage and Medication Refill Form
Formulario para obtener una cita medica y para rellenar medicinas

**Do not place the sick call request in the institution mail.**
**Failure to complete this form or follow any procedure delays processing your sick call complaint.**
Llene este formulario completamente y traigalo al Servicio de Salud para ponerlo en la caja designada para sick call. No ponga este pedido para cita medica en el correo de la institucion. No seguiendo este procedimiento o llenando este formulario incompletamente, tardara su cita medica.

(PLEASE PRINT)

NAME: Terri Mollica _____ (Nombre) **REG. No.:** 31860-001 (Numero de Registro)

Signature: Terri Mallica _____ (Firma)     **UNIT:** D (Unidad)

Today's Date: 8/26/2019 (Fecha de Hoy)

**What is your medical problem?** (Cual es su problema medico?)
Ovarian uterine pain & pressure.

**When did your problem begin or how long have you had the problem?** (Cuando comenzo su problema/ Cuanto tiempo ha tenido su problema?)
2016

**When were you last seen for your problem?** (Cuando fue la ultima vez que lo vieron por su problema?)
2018

**History of medical problems?** (Circle)     Diabetes (Hypertension) Cardiac Disease     Asthma
     Immunocompromised     Mental Health Problems

Por cuanto tiempo tiene este problema? (Circule uno) Diabetis  Hypertencion   Enfermedad Cardiaca  Astma
     Immunocomprometida     Enfermedad Mental

**Are you taking medicine?** (Circle one)(YES) NO  (Estas tomando medicina - Circule uno)  (Si)     (No)

**Do you Need Refills?** (Circle one)   YES (NO) (Necesitas rellenar tus medicinas? )   (Si) (No)

If yes, what is the name(s) of the medication(s) you need refilled? _____

Cual es el nombre de las medicinas que necesita rellenar? _____

**Have you had an injury?** YES (NO)     If YES, do you have pain? (Circle one)(YES) NO
(Le ha lesionado?)     (Si) (No)     (Tienes dolor?)     (Circule Uno) (Si) (No)

If yes, how long have you had pain: 3 days   If YES, where is your pain? (Si contestas Si, donde estas su dolor?) _____
(Por cuanto tiempo?)     abdomin, ovaries, Uterus, bladder

**If yes, rate your pain (circle one)   1    2    3    4    5    6    7   (8)   9    10**
(Como quantifica su dolor (circule uno)(0- No pain, 1-2 Mild, 3-4 Discomfort, 5-6 Moderate, 7-8 Severe, 9-10 Worst pain possible)
(0- No dolor, 1-2 Poco dolor, 3-4 Leve dolor, 5-6 Dolor moderado, 7-8 Dolor severo, 9-10 Peor dolor)

All non-medical problem requests including copies of Medical Records should be sent by regular Cop-Out through the institutional mail system. (Todos los problemas que no son de indole medicos, incluyendo copias de su record medico, seran dirigidos atravez de un Cop-Out y puesto en el correo de la institucion)

_____ **Do not write below this line** _____
(No escriba abajo de esta linea)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### TO BE COMPLETED BY HEALTH SERVICES STAFF ONLY.

Date Scheduled to be Seen: _____     HSU Staff Signature: _____

Health Care Provider Comments: _____     8/26/19 TM
\* Knopp - said she will put in for another Consultation.

Exhibit B - 6    Copy.

Thrned in 5/14/2020

Complex/Facility FCI (from camp)    **SICK CALL REQUEST FORM**
                                    **(Enfermo De Guardia Formulario De Solicitud)**

Date (Fecha): 5/14/2020 Name (Nombre): Terri Mallica    Number (Numero): 31860-001

Unit (unidad): D Camp (C-3) Work (Trabajo): Rec

What is the problem (Desriba su problema medico)? Tremendous pain in my

uterus from the tumors and transabdominal mesh (which

is scratching the inside of my abdomen.

---

How long have you had this problem (Cuanto tiempo ha tenido este problema)?

# days (dias):_____ # weeks (semanas):_____ # years (anos): Since 2016

Rate your pain (califique su dolor):  0  1  2  3  4  5  6 (7) 8  9  10

                    No pain              worst pain imaginable

---

What have you done for the pain (Que ha hecho para el dolor)?

Ibuprofin

---

What makes the pain better (Que reduce su dolor)? nothing

---

What makes the pain worse (Que incrementa su dolor)? Climbing on top bunk,

Walking

What makes the pain worse... Other health problems (Otros problemas de salud)?    Diabetes    Asthma (Asma)

(High Blood Pressure) (presion alta)

List the medications you take (Liste los medicamentos que toma):
Laranstan, pogesterone, propranalol

Allergies: Sulfa, bactrim

---

DO NOT WRITE BELOW THIS LINE    -    NO ESCRIBA DEBAJO DE ESTA LINEA

| VS: Temperature | BP | Pulse | RR | O2% |
|---|---|---|---|---|
| | | | | |

| Disposition |
|---|
| |

---

Signature of Staff Member completing form

EXHIBIT B-7

Copy -

Turned in 6/15/2020

Complex/Facility FCI (Snow Camp) **SICK CALL REQUEST FORM**
(Enfermo De Guardia Formulario De Solicitud)

Date (Fecha): 6|15|2020 Name (Nombre): Mollie     Number (Numero): 31860.009
Unit (unidad): C-3 (#210) from D unit Work (Trabajo): Rec

What is the problem (Desriba su problema medico)? Still having pain |excessive
bleeding from the tumors |mesh in my abdomen.

How long have you had this problem (Cuanto tiempo ha tenido este problema)?

# days (dias):_____ # weeks (semanas):_____ # years (anos): 4 yrs

Rate your pain (califique su dolor):  0  1  2  3  4  5  6  7 (8) 9  10

                    No pain              worst pain imaginable

What have you done for the pain (Que ha hecho para el dolor)?
Ibuprofin

What makes the pain better (Que reduce su dolor)? nothing

What makes the pain worse (Que incrementa su dolor)? lying down

Other health problems (Otros problemas de salud)?     Diabetes     Asthma (Asma)

High Blood Pressure (presión alta)

List the medications you take (Liste los medicamentos que toma):

Lanastan, propranolol, progesterone

Allergies: Bactrim, Sulfa

DO NOT WRITE BELOW THIS LINE     -     NO ESCRIBA DEBAJO DE ESTA LINEA

| VS: Temperature | BP | Pulse | RR | O2% |
|---|---|---|---|---|
| | | | | |

Disposition

_____

Signature of Staff Member completing form

Exhibit B-8

Copy

Sent 7/28/2020

Complex/Facility FCI (fron Camp)    **SICK CALL REQUEST FORM**
(Enfermo De Guardia Formulario De Solicitud)

Date (Fecha): 7/28/2020  Name (Nombre): Terri Mollica    Number (Numero): 31800.001

Unit (unidad): C-3 (#20)  Dun  Work (Trabajo): Rec

What is the problem (Desriba su problema medico)? Slipped and fell off of ladder

to top bunk today and hit uterus; heavy bleeding and

new perfusion (hernia) in abdomen / pelvis. Also, please issue

How long have you had this problem (Cuanto tiempo ha tenido este problema)? a Bottom Bunk pass

# days (dias):_____ # weeks (semanas):_____ # years (anos): 4yrs  until surgery is completed.

Rate your pain (califique su dolor):  0  1  2  3  4  5  6  7 (8) 9  10

                   No pain               worst pain imaginable

What have you done for the pain (Que ha hecho para el dolor)?

Ibuprofin

What makes the pain better (Que reduce su dolor)?

Nothing

What makes the pain worse (Que incrementa su dolor)? Climbing ladder, lying

down

Other health problems (Otros problemas de salud)?    Diabetes    Asthma (Asma)

High Blood Pressure (présion alta)

List the medications you take (Liste los medicamentos que toma):

Propranolol, lorcastan, progesterone

Allergies: Sulfa, bactrim

DO NOT WRITE BELOW THIS LINE    -    NO ESCRIBA DEBAJO DE ESTA LINEA

| VS: Temperature | BP | Pulse | RR | O2% |
|---|---|---|---|---|
| | | | | |

Disposition

_____

Signature of Staff Member completing form

Exhibit 13-9

BP-A0148
JUNE 10
U.S. DEPARTMENT OF JUSTICE

**INMATE REQUEST TO STAFF** CDFRM

**FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) Medical / Pharmacy | DATE: 9/30/2020 |
|---|---|
| FROM: Terri Mollica | REGISTER NO.: 31860.001 |
| WORK ASSIGNMENT: Rec | UNIT: D (#40) |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

I went on an outside medical trip on 7/09/2020, to Walker Women's Health.

Dr. Autery prescribed 2 new drugs- 1 to control bleeding & 1 to shrink uterine tumors. The Rx was given to Officer Paramore.

It has been almost 90 days and I have not received the medication.

Please advise on the status and when I can expect it.

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
|  |  |

Record Copy - File; Copy - Inmate

PDF                          Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER        **SECTION 6**

Exhibit B-10.1

**FCI Aliceville**

[Chart][TERRI MOLLICA][26921]

31860-001

[7/28/2020][Page 1 of 1]

# Procedure Note

| | | | |
|---|---|---|---|
| **Patient Name:** | TERRI MOLLICA | **Visit Date:** | July 9, 2020 |
| **Patient ID:** | 26921 | **Provider:** | LORISSIA AUTERY, MD |
| **Sex:** | Female | **Location:** | Walker Women's Specialists |
| **Birthdate:** | May 14, 1966 | **Location Address:** | 304 Blackwell Dairy Rd<br>Jasper, AL 35501-8907 |
| | | **Location Phone:** | (205) 384-4801 |

------------------ENDOMETRIAL BIOPSY------------------------

**Indications:**
This is a 54 year old female, G0 P0000, whose LMP was on 07/07/2020. The patient has a history of WHAT IS THE DIAGNOSIS and presents for an endometrial biopsy. After the indications, risks, benefits, and alternatives to performing an endometrial biopsy were explained to the patient her questions were answered and informed consent was obtained and signed.

**Procedure:**
The patient was placed on the table in the supine lithotomy position. She was draped in the appropriate manner. A speculum was placed in the vagina. The cervix was visualized and prepped with BETADINE. A tenaculum WAS A TENACULUM USED.
A small plastic 5 mm Pipelle syringe curette was inserted into the cervical canal. The uterus was sounded to HOW MANY CM OF SOUNDING cm's. A vigorous four quadrant biopsy was performed, removing a HOW MUCH TISSUE WAS REMOVED amount of tissue. This tissue was placed in Formalin and sent to pathology.

The patient tolerated the procedure well and she reported mild cramping. The tenaculum was removed from the cervix and the speculum removed.

**Post Procedural Status:**
The patient was observed for 5 minutes. There were no complications. The patient was discharged in stable condition.

## Assessment

- Menorrhagia    626.2/N92.0
- Dysfunctional Uterine Bleeding    626.8/N93.8

Problems Reconciled

## Plan

**Orders**
- o  Endometrial biopsy (58100, 58110) - - 07/26/2020

**Medications**
- o  Medications have been Reconciled
- o  Transition of Care or Provider Policy

**Instructions**
- o  Call if severe pain, fever, heavy bleeding or other unusual symptoms occur
- o  Patient will be contacted with biopsy report and further treatment recommendations provided

**Electronically Signed by:** LORISSIA AUTERY, MD -Author on July 26, 2020 08:14:42 PM

[Digital Signature Validated]

[Chart][TERRI MOLLICA][26921]

## WALKER WOMEN'S SPECIALISTS

| Name | MOLLICA, TERRI | ID | 26921 | Exam. Date | 07-09-2020 |
|---|---|---|---|---|---|
| Gender | Female | BirthDate | 06-14-1966 | Age | 54yr 1m |
| Institute | WALKER WOMEN'S... | Diag. Physician | DR AUTERY | Sonographer | DELISHA SIM... |
| Description | UT FIBROIDS | | | | |

### [ Gynecology ]

| | | Avg. | 1 | 2 | 3 | |
|---|---|---|---|---|---|---|
| Uterus | | | | | | |
| Uterus L | | 18.48 | 18.48 | | | cm |
| Uterus H | | 8.95 | 8.95 | | | cm |
| Endo. Thick | | 0.88 | 0.88 | | | cm |
| Rt. Ovary | | Avg. | 1 | 2 | 3 | |
| Rt. Ovary L | | 3.55 | 3.56 | | | cm |
| Rt. Ovary H | | 2.23 | 2.23 | | | cm |
| Lt. Ovary | | Avg. | 1 | 2 | 3 | |
| Lt. Ovary L | | 4.15 | 4.15 | | | cm |
| Lt. Ovary H | | 2.39 | 2.09 | | | cm |
| Uterine Tumor 1 | | Avg. | 1 | 2 | 3 | |
| Length | | 13.27 | 13.27 | | | cm |

Comment
LARGE UT FIBROID OFF FUNDUS OF UT

07-09-2020 08:53 am

**TRULINCS 31860001 - MOLLICA, TERRI MCGUIRE - Unit: ALI-D-D**

---

FROM: Warden
TO: 31860001
SUBJECT: RE:***Inmate to Staff Message***
DATE: 03/02/2020 10:47:02 AM

Ms. Mollica, please follow up with your Case Manager regarding your request for a Compassionate Release.

>>> ~^!"MOLLICA, ~^!TERRI MCGUIRE" <31860001@inmatemessage.com> 2/28/2020 5:51 PM >>>
To: Ms. Bradley
Inmate Work Assignment: Rec

Hi Ms. Bradley. I sent a request for compassionate release to you (via the prison mail system) on 2/05/2020. I just wanted to make sure that you have received it. Thanks.

8/3/2020

Case 7:20-cv-01768-RDP-SGC   Document 1   Filed 11/09/20   Page 26 of 49
These Women Received a Death Sentence for Being Sick In Prison – Reason.com

Exhibit D

PRISONS

# These Women Received a Death Sentence for Being Sick In Prison

A *Reason* investigation has identified three deaths from alleged medical neglect at FCI Aliceville, a federal women's prison. Current and former inmates say it's routine, but the Bureau of Prisons won't talk about it.

**C.J. CIARAMELLA** | 6.30.2020 9:00 AM



FCI Aliceville (Bureau of Prisons)

In the early hours of March 18, 2019, Hazel McGary's cellmate woke up to find her on the floor.

This was all too common. McGary, an inmate at FCI Aliceville, a federal women's prison in Alabama, had been having escalating health problems, including falling out of bed. Her cellmate had been taking care of her, escorting her in a wheelchair to and from the prison's medical center several times a week, where McGary had been waging a monthslong battle with indifferent prison officials to prove she was seriously ill.

Something different happened that morning, though, when staffers took McGary to the prison's medical services. She didn't come back.

Hazel McGary is one of three inmates identified by *Reason* who have died from alleged medical neglect since 2018 at FCI Aliceville. Numerous current and former inmates, as well as their families, say in interviews, desperate letters, and lawsuits, that women inside Aliceville face disastrous delays in medical care. They describe monthslong waits for doctor appointments and routine procedures, skepticism and retaliation from staff, and terrible pain and fear.

The Bureau of Prisons (BOP) listed the cause of death in all three cases as "natural causes," according to public records obtained by *Reason*. That classification, while technically correct, erases the culpability of the agency. It's like claiming a man accidentally drowned after you refused to throw him a life preserver.

But the agency doesn't want to talk about what happened. When asked for more information, the BOP public affairs office said the agency "does not disclose the details of an inmate's death." The FCI Aliceville public information officer did not return multiple requests for comment. *Reason* has been waiting for more than a year for additional Freedom of Information Act records concerning these incidents.

None of these women was ever sentenced to death. But in Aliceville, that's effectively the sentence they received—for nothing more than the crime of being sick.

Although the severity of their offenses is irrelevant to their constitutional rights, all three were serving sentences for nonviolent crimes. Under the Eighth Amendment, which prohibits cruel and unusual punishment, the government had a legal obligation to provide basic necessities to them, including health care. This requirement is ostensibly what separates our enlightened justice system from the sadism of the past.

Their deaths are a reminder that the barbarism the Constitution intended to forbid never really disappeared and is still with us today. They also point toward the need, at the very least, for stronger independent oversight of the BOP's medical services. At most, they raise the question of whether these women and other offenders should be sent to prison at all, given the U.S. government's inability to meet the Eighth Amendment's low bar.

Beyond abstract principles, each one of these women had families who loved them. McGary's daughters, Kentiesha and Apolonia Kimble, had been calling the prison for months trying to get help for their mother.

**TOP ARTICLES**    1/5



Connecticut Passes Law Curbing Back Qualified Immunity—but with Loopholes

»

"They ain't do nothing," Kentiesha tells *Reason*. "They laughed at her. They said she was faking. They told us she was too young to be having a heart attack."

**'We called the jail. They were hanging up in our face.'**

Prior to her death, McGary had been going to Aliceville's medical center several times a week, complaining of chest pain, fatigue, and shortness of breath, according to an account written by Aliceville inmate Cheryl Singleton and sent to Strickland Webster, LLC, an Atlanta law firm. Singleton wrote that McGary's vitals consistently showed "extremely high blood pressure," but medical staff kept telling her to come back later.

One doesn't simply stroll in to see a doctor or a nurse in federal prison. Inmates must ask a corrections officer for an appointment as the officer walks by at "sick call" every morning. If you miss it for whatever reason, tough luck. You have to wait until the next morning, unless you're quite literally dying. Inmates put on the sick call list then go to a waiting room and wait, often for hours.

"Sometimes at sick call, you don't get seen until 2 o'clock in the afternoon," says Caroline Trude-Rede, a former inmate at FMC Carswell, a federal prison hospital for women in Texas.

D-3

Singleton wrote that McGary's health problems started after a two-week stint in the "special housing unit" or SHU, a sanitized term for solitary confinement, where she experienced panic attacks, shortness of breath, and chest pains.

Her health began to seriously deteriorate in January 2019, according to Singleton's account. McGary began suffering from severe fatigue, which was exacerbated by her being housed on an upper floor, requiring her to climb stairs to go to and from her cell.

By February, she was mostly confined to a wheelchair and could barely stand. McGary's daughters say they were sending money to her cellmate, Crystal Green, to escort their mother to and from meals, showers, and her increasingly frequent trips to Aliceville's medical services. But both McGary's daughters and Singleton say she was turned away time and time again.

"I called Washington, I called the mayor's office, I called region [BOP's Southeast Regional Office]. Nobody could help us," Kimble says. "We called the jail. They were hanging up in our face."

Hazel McGary

Finally, on the morning of March 18, 2019, Green woke up to find McGary on the floor.

"Why didn't you call my name like you usually do?" Green asked, according to Singleton's account.

McGary said she tried as loud as she could. Green pressed the medical emergency button, and five minutes later the staff came to take McGary away.

"They took her to medical, and that was the last time Green saw Hazel alive," Singleton wrote.

McGary's daughters say they didn't receive a call from the prison about their mother until around 4 p.m., hours after she had died. "We were sitting around not even knowing our momma was dead," Kimble says.

The daughters say an autopsy determined that McGary died of a blood clot that traveled from her leg to her heart. McGary's daughters also say the prison never sent them their mother's personal belongings, which they assume were destroyed.

The most disturbing part of reading the pleas for help from inmates at Aliceville is that many of them can plainly see what's coming, but they're powerless to stop it.

On March 9, 2019, a little more than a week before her roommate would wake up to find her on the floor of her cell, McGary sent a letter to the lawyers at Strickland Webster begging for help. The letter describes McGary's months of futile trips to the prison's medical services, the "heat rush" she felt in her chest every time she had to climb stairs, her suspicions that her medical records were being altered or destroyed, and staff's open contempt for her. The letter says that when she finally managed to get a meeting with officials from the BOP's regional headquarters, they tried to blame her heart problems on drug use or syphilis.

"I have been told for over eight months I am scheduled for a visit to the cardiologist," McGary wrote. "Still have not made it there yet. The warden and the region are useless. They send us through all of these long, drawn-out procedures. By the time [they're done] we will be home or dead."

Nine days after she sent that letter, her latter prediction came true. She was 49 years old.

### 'Y'all, they killed her, they killed her'

Almost a year to the day before Hazel McGary's death, another family received a heartbreaking call from Aliceville federal prison. Rosemary Ofume, 59, died on March 21, 2018.

Ofume had only been transferred to the prison earlier that month. According to her family and a civil rights lawsuit filed this March, she became seriously ill after having an adverse reaction to an unnecessary tuberculosis test that she was coerced into taking.

The lawsuit says Ofume "vocally objected to being administered this test on the grounds that she had been given the test twice before and her doctor warned her not to let anyone give her that test again due to hypersensitivity concerns."

Rosemary Ofume (center) with her two sons, Grant Iriele (left) and Stanley Iriele (right). (Courtesy of Grant and Stanley Iriele)

Ofume's health declined dramatically between March 15 and 19. She had a bad cough.

The lawsuit claims medical staff at Aliceville "were well aware of Rosemary's suffering and serious medical need because when she was at the clinic [they] belittled her, turned her away, refused to diagnose her or otherwise provide her with medical care."

Lorri Jackson-Brown was incarcerated at Aliceville until this May. She says she witnessed four inmates suffer fatal medical neglect at the prison during her stint there, including Ofume, McGary, and Doris Nelson, whose case is discussed further below. (The fourth case, not discussed in this story, is former Aliceville inmate Jean Cox. In 2017, A federal judge granted compassionate release to Cox, at the request of the BOP, after she was



diagnosed with terminal cancer. *Reason* has been unable to learn more about that case.)

" When I met Ms. Rosemary, somebody was wheeling her out [of the prison's medical center], and she was in tears," Jackson-Brown says. "I knew the girl that was pushing her. I asked what's wrong with her. She said, 'They won't even see her. This lady is sick, she's spitting up blood.'"

Throughout her sickness, Ofume was in frequent contact with her children.

"I spoke to my mother the night before, and I remember pleading with her to get something to eat," Ofume's son Grant Iriele says. "She was saying that it was hard for her to make it to get something to eat because she felt so weak and drained."

Iriele says attorneys who interviewed inmates at Aliceville after Ofume's death were told that her skin had taken a sickly dark gray, dark blue color— a sign of cyanosis, which is caused by oxygen-depleted blood.

At the time, though, Iriele and the rest of his family thought she just had a bad cold. But the next morning, the prison called to deliver the news that she had died.

According to the lawsuit, which relies on eyewitness accounts from other inmates, Ofume was having severe breathing problems. Her cellmate pressed the emergency button to try to summon help, but the corrections officer who responded told her to fill out paperwork and wait for the next sick call. The roommate went to try and get medication. When she came back, Ofume's condition was worse, and the roommate hit the button again, only to be dismissed by corrections officers, again. The third time her roommate hit the emergency button, a different officer took the situation seriously, but by that time it was too late. Ofume was unresponsive.

"They locked us down that morning, and we knew something was wrong because we saw them running to her building," Jackson-Brown recalls. "That same girl who was pushing her came out later crying. She said, 'Y'all, they killed her, they killed her.'"

Iriele says that when his family asked for his mother's body to be sent to them so that an independent autopsy could be performed, the BOP told them that it would not be released for two months.

The lawsuit says the BOP relented under pressure, and an independent autopsy found that Ofume died of pulmonary embolisms—small blood clots in her lungs.

The Mayo Clinic notes that pulmonary embolisms are fatal in about one-third of untreated cases, but "when the condition is diagnosed and treated promptly, however, that number drops dramatically."

Iriele believes Aliceville is trying to cover up its mistakes. Portions of her medical records turned over by the BOP are missing or sloppy, the lawsuit says. His mother was also a meticulous note-taker, but Iriele says that when her journal was returned to the family along with her other belongings, several pages had been torn out from around the date when she received the tuberculosis test.

The most infuriating part, he says, has been what details he has learned from other Aliceville inmates.

"Her roommate kept pulling the alarm to get people's attention, and they kept turning it off and callously telling [the roommate] to take her to the sick bay when it opened, which is not their protocol for when someone is in danger," Iriele says. "They saw that she was unwell, and they couldn't care less."

**'I stay in pain and medical's not doing anything for me. They won't do anything.'**

Last year, three months after McGary's death, another inmate died.

Doris Nelson's sentencing documents show a federal judge recommended to the BOP in 2015 that she serve her sentence at a federal prison in Dublin, California, due to health issues. Instead, she ended up in Aliceville, where she taught classes for other inmates.

"She taught classes with me," Jackson-Brown says. "Very nice lady, I loved Mrs. Nelson. One day I just happened to look up, and she's in a wheelchair."

Jackson-Brown asked her what was wrong, and she says Nelson told her she felt flushed and couldn't walk: "She said, 'I stay in pain and medical's not doing anything for me. They won't do anything. I don't know what's going on with me."

One day, Nelson delivered some startling news.

"She said, 'Do you know now these fools want to tell me they think I have cancer, and I've had it for a long period of time?'" Jackson-Brown remembers. "She said, 'Who does that? Now all of a sudden you want to let me know I've got cancer?'"

"I told her to meet me at the library on a Saturday," Jackson continued. "Two days later she was dead."

Nelson, 60, died at Aliceville on June 14, 2019.

"There was an ongoing struggle to get her diagnostic treatments," an attorney for Nelson's family told the Spokane, Washington, newspaper *Spokesman-Review* after her death. "She was in terrible pain and when I know more, I'll advise the family."

**'I'm lucky to be alive.'**

Some inmates say they barely escaped Aliceville with their lives. Holly Frantzen, 49, says she was fit and healthy when she first arrived at the prison in 2019. The only medication she was on was Effexor, an antidepressant.

Extended-release Effexor is only supposed to be ingested via capsule, according to the Mayo Clinic, which notes that one of the less-common side effects is rapid and irregular heartbeat.

However, Frantzen says Aliceville staff abruptly began pouring it out of the capsule and giving it to her in a cup, either dry or suspended in water.

Frantzen says she complained that the crushed pills were making her feel strange, but she was ignored. Worse, she says the prison forgot to refill her prescription, leaving her without medication for three days, which is also not recommended because of severe withdrawal symptoms. Frantzen's prescription was finally refilled, and she was given another crushed dose in the pill line that evening.

She doesn't fully remember what happened the next morning, June 4, 2019.

"I guess I got up and woke my bunkie early in the morning and told her my arms and chest hurt, and I was real hot," Frantzen writes in an email. "The guard opened the doors, my bunkie went and got me some ice water, and I stiffened up and fell over. My heart stopped."

Frantzen says a staffer eventually resuscitated her via CPR, but she remained in a coma for about two weeks. The BOP never informed her family, according to Frantzen and her father, Weldon Wyckoff.

"We were emailing every day, and all of a sudden the emails stopped," Wyckoff says. "I didn't know what was going on for about a week. Ten days later I got a letter from one of the people she was incarcerated with that told me what happened."

Wyckoff says the BOP has a moral responsibility to inform families. "Just because people are incarcerated doesn't mean that they don't have meaning," he says.

Frantzen was transferred to FMC Carswell and now has a defibrillator in her heart.

"They would just brush you off and tell you to go buy Tylenol at the commissary," Frantzen writes of her time in Aliceville. "It was awful really. They did not even call my family and let them know I was in a coma ... So now here I am with PTSD [post-traumatic stress disorder] about meds and medical staff. I am lucky to be alive."

**'What these people did is inhuman.'**

"It's so traumatic that I don't think I want to relive it, because what these people did is inhuman," a former Aliceville inmate says in an interview with *Reason*.

The woman, who wishes to remain anonymous, was incarcerated at Aliceville for four months between late winter 2013 and spring 2014. Now in her mid-30s, she says she suffered unbearable uterine pain and bleeding, and that prison staff and doctors repeatedly tried to coerce her into having a hysterectomy.

Before she arrived in the federal prison system, she says a doctor had prescribed her birth control to manage pain and bleeding from a previous surgery for ovarian cysts that resulted in one of her ovaries and one of her fallopian tubes being removed. But once inside prison, she was taken off birth control, and soon she began experiencing excruciating pain and heavy bleeding.

"I was going to lose my mind, I was so in pain," she says.

The woman says at one point a physician assistant at Aliceville performed a vaginal exam on her using forceps. However, all she could cajole out of the prison staff for her pain and bleeding was extra-strength Tylenol with codeine.

She was only transported to a local hospital to see a doctor, she says, after her family enlisted then-U.S. Sen. Bill Nelson, a Democrat who represented Florida, to contact the prison on her behalf.

Inmates and their families often try to recruit their representatives in Congress to press the BOP into action, with mixed results. For example, *Reason* reported in 2018 that Rep. Rob Wittman (R–Va.) contacted the BOP three times on behalf of the family of Frederick Turner, a nonviolent drug offender who was sent to a violent, gang-ridden federal penitentiary where he feared for his life. Turner's requests for transfer were denied, and he was later found dead in his cell.



When the woman was finally taken to a local hospital, she says the doctor and prison officials tried to pressure her several times into having her remaining ovary removed. When she refused to consent to the surgery, she says she was retaliated against. She was put in the SHU and had her wheelchair, which she used when the pain became too intense, taken away.

"I'm a black woman with an accent who committed a crime, and to them I have no right to think that I should have kids or should want to procreate," she says.

After several months of refusing to consent to surgery, she says she was abruptly transferred to FMC Carswell, where she saw "stomach-wrenching" medical neglect, including one woman who died of kidney disease.

"She could barely walk, her hair was falling off, she looked like a zombie, and surely enough, she died," the former inmate says. "Her family did apply for compassionate release. They never released her. They let her die in prison."

After she was eventually released from federal prison, the woman had a successful surgery to remove a cyst from her remaining ovary, but she says she still has long-term issues stemming from her incarceration.

"I still wake up at 5, 5:30 every day," she says. "If I don't get off my bed, I still hear them knocking on my door. I know I have PTSD."

**'She belongs to the BOP.'**

A mother of another current Aliceville inmate who wished to keep her daughter's name anonymous to avoid retaliation says her daughter has been waiting for a routine surgery since last July.

"She was told by one person there at the health services administration that until she was throwing up blood every day, they weren't going to do anything for her," the mother says.

The delays, uncertainty, and fear weigh heavily on family members of incarcerated people.

"If they took her to the hospital, or something horrible happened, I'm not even going to know until it's all over, because in an emergency situation, they don't contact me," the mother says. "In their eyes, she's really no longer my daughter. She belongs to the BOP."

Meanwhile, the women at Aliceville wait. One current Aliceville inmate says she is confined to a wheelchair because of ongoing medical neglect at the prison.

"I used to walk, and after medical neglect I am now in a wheelchair 24/7, 365!" Aliceville inmate Kerstin Jones writes in an email. "I was also witness to three inmate deaths here."

Jones says she ended up in a wheelchair after suffering a grand mal seizure and a mild stroke. She also also says it took Aliceville officials nine months to send her out for an MRI, then another eight months to see a neurologist.

"What upsets me is the fact that they told me here that there was nothing wrong with me," Jones writes. "They tell people that excuse all the time, and that's how they die here."

"We have women that have been told they have a short time to live, and they still will not do anything for them medically," Jackson-Brown wrote in an email before her release. "One woman has only 13 percent of her heart working, and they don't do anything for her. One woman has severe lupus, and they get her half the treatment that she needs. The list can go on and on."

In her last letter to the Atlanta law firm, McGary mentioned an inmate with lupus as well.

"These medical experts have a lady here with lupus," she wrote. "They have been altering her results back and forward. She's been on a catheter for over four months. And they won't send her to the nearest medical facility. These people here tell us to not hit the panic button unless our bunkies are dying [...] Our lives here are in harm's way."

Since COVID-19 began sweeping through the federal prison system in late March, Frantzen and other inmates have been petitioning wardens and federal judges to grant them compassionate release. Frantzen filed a court petition on May 18, seeking compassionate release, arguing that, as a survivor of sudden cardiac arrest, she was at elevated risk for complications and death if she contracted COVID-19. A federal judge denied her petition a day after it was filed.

**'The level of a constitutional violation'**

It's not just inmates, though, who have found Aliceville's health care dangerously deficient. Last July, a federal judge granted Aliceville inmate Angela Beck's petition for compassionate release after finding that Beck had suffered "grossly inadequate" delays in treatment for aggressive breast cancer while incarcerated.



U.S. District Judge Catherine Eagles ruled, over the opposition of federal prosecutors and the BOP, that Beck's "invasive cancer and the abysmal health care Bureau of Prisons has provided qualify as 'extraordinary and compelling reasons' warranting a reduction in her sentence to time served."

According to Eagles' order, Aliceville officials made Beck wait two months for imaging after she first found lumps in her left breast. Then she had to wait eight months for a biopsy, which confirmed the cancer, and two more months for surgery. By that time, the cancer had spread to her lymph nodes, requiring a radical mastectomy. Five more months passed before Beck's first appointment with an oncologist, who determined that it was too late to begin chemotherapy at that point.

Eagles wrote that the neglect Beck suffered "likely reached the level of a constitutional violation," and that if she remained in BOP custody, she would continue to face "a substantial likelihood of substandard medical care for her life-threatening disease."

Such orders are rare, though, and court dockets around the country are stuffed with similar claims.

Another Aliceville inmate, Terri Mollica, filed a petition for compassionate release in March, citing Beck's case. According to a federal judge's ruling on her petition, Mollica has an untreated uterine fibroid that weighs roughly 15 pounds and "causes 'visible protrusions' from Ms. Mollica's abdomen and causes her pain, uterine bleeding, anemia, infection, and fevers." She has been waiting in pain for nearly four years for outside treatment since an Aliceville physician first diagnosed the fibroid in 2016.

However, despite finding that Mollica's condition was "undoubtedly a very painful burden," U.S. District Judge Karon Bowdre ruled that Mollica had not proven she was at risk of death and that she wasn't debilitated "to the extent that she cannot care for herself." Bowdre recommended that Mollica file an Eighth Amendment lawsuit.

### 'Deliberate indifference'

Maria Morris, a senior staff attorney at the American Civil Liberties Union's (ACLU) National Prison Project, says that, while prisoners are guaranteed health care under the Eighth Amendment, the standard of care is fairly minimal. Under current Supreme Court precedent, an inmate challenging inadequate healthcare must show "deliberate indifference" by officials.

"I choose to believe that there are some prisons and jails that are doing a reasonably good job," Morris says. "That said, at the ones that I have looked at—and I'm often caused to look at them due to complaints—it's abysmal."

Morris says that in the prisons and jails she investigates she often finds officials generate paperwork to give the illusion of care, while doing little to actually address medical issues.

"There are a shocking number of incidents in the health care systems that I've looked at where problems are acknowledged and then essentially ignored. Sometimes that can go on for weeks or months or even years."

"You see a complete lack of interest in resolving problems," she continues. "You see people who have a serious problem one day, and then the next day it's completely fine, according to the paperwork. Then the next day someone else is saying everything is terrible. You see people dying of bedsores."

That's not hyperbole. The ACLU has been in litigation with the Arizona Department of Corrections since 2012 over its healthcare services or lack thereof. *Courthouse News*, a news outlet that covers legal news around the country, summarizing a report by an independent doctor who toured one Arizona prison, described it as "an understaffed system in which an inmate died with infected lesions swarmed by flies, a man who ate his own feces was never seen by a psychiatrist, and a woman swallowed razor blades while allegedly under constant watch."

Crystal Munoz was incarcerated at FMC Carswell, the federal prison hospital for women in Texas, for eight years, until President Donald Trump granted her clemency this February. She says she saw three women there die from negligence.

In one instance, she says she was sitting in sick call when she saw a woman pushing another inmate in a wheelchair. The two were banging on the door, begging for someone to look at the woman in the wheelchair, but they were repeatedly told to sit back down.

"After about three times, she pushed the lady in the wheelchair to the restroom, which was just right around the wall from where we were sitting, and [the woman in the wheelchair] fell over and died of a heart attack."

"Had the staff paid attention in that moment instead of telling them to get away from the door and go sit down—you know, basically wait their turn—then the lady would still be alive."

The *Fort Worth Weekly* newspaper published investigations in 2007 and again in 2012 detailing suspect deaths and abysmal medical care at Carswell.

The newspaper reported that in one case, "an ant infestation, in a ward for paralyzed and wheelchair-bound women, was so bad that ants were found swarming over—and in one case, inside—the women's bodies."



Although the BOP declined to comment on McGary, Ofume, or Nelson's deaths, a spokesperson sent *Reason* a statement copied from a page on the BOP's website about its health care services, which says the agency "has trained medical personnel at all of our correctional institutions and these institutions provide essential medical, dental, and mental health (psychiatric) services in a manner consistent with accepted community standards for a correctional environment. The BOP uses licensed and credentialed health care providers in its ambulatory care units, which are supported by community consultants and specialists."

## An Unanswered Question

This story could have been written about any number of prisons or jails. Medical neglect of incarcerated people is a problem across the country on federal, state, and local levels. It's a national disgrace—the kind people prefer to ignore. Prison officials downplay or hide the scope of it, there is a high bar for inmates trying to bring Eighth Amendment lawsuits challenging prison conditions, and the public by and large pays little attention to what happens behind prison walls.

Inmates know all this, but they send emails and letters anyway, like messages in bottles, hoping they will drift by chance to someone who can do something about it.

Last year on March 18, the day that Hazel McGary died, another woman at Aliceville sent an email to her mother, who in turn sent it to FAMM, a criminal justice advocacy group. FAMM passed the message along to *Reason*, which led to this investigation.

"Today the fourth person died since I have been here," the inmate, who wishes to remain anonymous for fear of retaliation, wrote. "She died in medical at around 1 p.m. after sitting in medical complaining of chest pains since 8 a.m., waiting to be seen. My friend from my unit was in medical with her and described the lack of concern shown to this poor woman. Her family I pray learns the truth of how she died, in the hallway slumped over in a wheelchair, until she fell out into the floor dying, laying there with no one rushing over to assist her—praying for an ambulance that never came."

"My friend told me that that lady today in medical kept saying, 'I am going to die, I am going to die,'" the message continued. "And she did … but did she have to?"

That's a question *Reason* has been asking for the last year, and a question the BOP appears to have no interest in answering.

*Zuri Davis contributed to this story.*

*Note: Written accounts from inmates in this story have been edited for clarity and style.*

**C.J. CIARAMELLA** is a reporter at *Reason.*

PRISONS    FEDERAL PRISONS    CRIMINAL JUSTICE    EIGHTH AMENDMENT

Exhibit E-1

BP-S358.060
SEP 05

**MEDICAL TREATMENT REFUSAL**

**CDFRM**

U.S. DEPARTMENT OF JUSTICE

FEDERAL BUREAU **OF PRISONS**

11-**27-2018**
Date

I, TERRI MOLLICA                  31860-001  , refuse treatment recommended by the **Federal**
**Bureau of Prisons Medical staff for the following condition(s):**

**DESCRIBE CONDITION IN LAYMAN'S TERMINOLOGY:**

OB/GYN consult for evaluation and treatment management for uterine fibroids and cysts

**The following treatment(s) was/were recommended:**

OB/GYN consult for evaluation and treatment management for uterine fibroids and cysts

**Federal Bureau of Prisons Medical staff members have carefully explained to me that the following possible consequences and/or complications may result because of my refusal to accept treatment:**

results will remain unknown and untreated

I understand the possible **consequences and/or complications, listed above, and still refuse recommended treatment. I hereby assume all responsibility for my physical and/or mental condition, and release the Bureau of Prisons and its employees from any and all liability for respecting and following my expressed wishes and directions.**

KNOPP, E. RN, BSN          11-27-2018
Counseled by                    Date

Patient's Signature          **Date**

* Not Patients
Signature

Signature of Witness          Date

ALI--ALICEVILLE FCI

Exhibit E-2

# Bureau of Prisons
# Health Services
## Clinical Encounter - Administrative Note

| Inmate Name: | MOLLICA, TERRI MCGUIRE | | | | Reg #: | 31860-001 |
|---|---|---|---|---|---|---|
| Date of Birth: | 05/14/1966 | Sex: | F | Race: WHITE | Facility: | ALI |
| Note Date: | 08/11/2020 10:56 | Provider: | | Bailey, Sharon RN | Unit: | C03 |

Admin Note - Chart Review encounter performed at Health Services.
**Administrative Notes:**

    ADMINISTRATIVE NOTE   1      Provider:   Bailey, Sharon RN

        Inmate submitted a written request for a lower bunk restriction stating that she has a 15 lb tumor in her uterus. Chart review revealed inmate diagnosed with a an enlarged uterus four years ago and an OB/GYN consult was entered. Inmate refused to go out on several occasions, but was finally seen about a month ago and biopsies were done that revealed growths are benign. Inmate diagnosed with fibroids. Inmate does not appear to meet any of the 2012 Kendig memo criteria for a lower bunk restriction at this time. Scheduled for MLP.

Schedule:

| **Activity** | **Date Scheduled** | **Scheduled Provider** |
|---|---|---|
| Sick Call/Triage | 08/25/2020 00:00 | MLP 03 |

8-11-20 wants lower bunk r/t fibrotic uterus.

**Copay Required:** No       **Cosign Required:** No
**Telephone/Verbal Order:**   No

Completed by Bailey, Sharon RN on 08/11/2020 11:01

Exhibit C-3

BP-S148.055 **INMATE REQUEST TO STAFF**  CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                     **FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) Medical Records | DATE: 9/18/2020 |
|---|---|
| FROM: Terri Mollica | REGISTER NO.: 31860.001 |
| WORK ASSIGNMENT: Rec | UNIT: D |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)

I received my FBoP medical records for the period
11/01/2020 - present, which included my outside doctor
visit to Walker Women's Specialists (Dr. Autery) on 7/09/2020.

The complete record for the visit was 22 pages. I received
pages 5, 6, 14, 15, 16, 17, 18, 19, 20, 21. I am missing 12
pages. Can you please send to me?

Thanks!

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94


PRINTED ON RECYCLED PAPER

Exhibit F-1

# FEDERAL CORRECTIONAL INSTITUTION
## ALICEVILLE, ALABAMA
### INFORMAL RESOLUTION FORM

Inmate Name: Terri McGuire Mollica     Reg. No. 31860·001
Unit: D     Date: 10/31/2019

**NOTICE TO INMATE**: You are advised that normally prior to filing a Request for Administrative Remedy, BP-229(13), you must attempt to informally resolve your complaint through your Correctional Counselor. Please follow the three steps listed below:

1. State your complaint: Since 2016, I have had severe pain in my lower abdomin, uterus and ovaries. I experience heavy monthly bleeding, am anemic, and regularly have an upset stomach and run fevers.

   (If more space is needed, you may use up to one letter size (8 1/2 x 11) continuation page. You must also submit one copy of supporting exhibits. (Exhibits will not be returned with the response to BP-229(13) responses.))

2. State what actions you have made to informally resolve your complaint: The FCI medical staff diagnosed me with a 10cm fibroid tumor on my uterus and 2-5 cm cysts on my right ovary in 2016, but no treatment. On 8/20/2019, I went to sick call and requested that I receive treatment.

3. State what resolution you expect: I would like to see a specialist/surgeon to determine the best course of action, within the next 30 days.

Inmate's Signature: Terri McGuire Mollica     Date: 10/31/2019

Correctional Counselor's Comments (Steps to Resolve): Forwarded to Medical via email.

Counselor's Signature: _____     Date: 11/5/19
Unit Manager's Review: _____     Date: 11-12-19
Informally Resolved: _____ NJ     Date: 12-3-19

| | BP-8 ISSUED | BP-8 RETURNED | BP-9 ISSUED | BP-9 RETURNED | REMEDY CLERK |
|---|---|---|---|---|---|
| DATE | 10 30 19 | 11-1-19 | 12-3-19 | | |
| TIME | 12° 1 ~ | 10°° A | 12 °° PM | | |
| COUNSELOR | | | | | |

I've reviewed inmate Mollica's complaint and her medical chart. She will be scheduled to see a provider. Please have her watch the call-out for this appointment.

UNICOR FEDERAL PRISON INDUSTRIES, INC.
LEAVENWORTH, KANSAS

Exhibit F2 o1

**U.S. DEPARTMENT OF JUSTICE**

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

---

*Type or use ball–point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | Mollica, Terri M. | 31860-001 | D | SPC Aliceville |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST**

Since 2016, I have had severe pain in my lower abdomen, uterus, and ovaries. I experience heavy monthly bleeding, am anemic, and regularly have an upset stomach and run fevers.

The FCI Aliceville medical staff diagnosed me with a 10cm fibroid tumor on my unterus and two 5cm cysts on my right ovary in 2016. In 5/2017, I went on a medical trip and saw an outside doctor, who confirmed the fibroid and cysts and recommended surgery. In 11/2018, I was scheduled for another outside medical trip, but due to heavy bleeding, the doctor requested that FCI Aliceville reschedule the appointment. So far, I have received no treatment.

On 8/26/2019, I went to sick call at SPC Aliceville and requested that I receive treatment. I was told I would be put on the call-out to see a provider. On 10/30/2019, I completed a form 8.5, and again was told that I would be placed on the call-out to see a provider.

As of this date, I have not received any treatment or additional consults for this problem. I would like to be seen by an outside specialist or surgeon to determine the best course of action, within the next thirty (30) days.

| 12/04/2019 | Terri M. Mollica |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

**Part B– RESPONSE**

| DATE | WARDEN OR REGIONAL DIRECTOR |
|---|---|

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE

CASE NUMBER: _____

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

Exhibit F2.2

TRULINCS 31860001 - MOLLICA, TERRI MCGUIRE - Unit: ALI-D-D

----------------------------------------------------------------------------------------------------

FROM: AW Operations
TO: 31860001
SUBJECT: RE: ***Inmate to Staff Message***
DATE: 02/14/2020 2:17:02 PM

Ms. Mollica, thank you for your patience, your BP-9 is still under review and a response is being generated, you will be receiving a response soon.

>>> ~^!"MOLLICA, ~^!TERRI MCGUIRE" <31860001@inmatemessage.com> 2/13/2020 9:21 AM >>>
To: Mr. Thomas
Inmate Work Assignment: Rec.

Hi Mr. Thomas. I am not sure if you are the proper person to handle this, but I am trying to follow up on my form 9, which was submitted by Counselor Johnson around 12/10/2019. I received a receipt stating that I would have a response by 1/02/2020.

As of today, I have not received a request to extend the time nor an actual response.

I am ready to file my form 10, but Counselor Johnson has told me that I cannot until I have a response from the 9.

Can you please check on that request or, in the alternative, respond to this request with a denial, so that I may proceed?

Thanks for your help.

Exhibit F 2.3

RECEIPT - ADMINISTRATIVE REMEDY

DATE: DECEMBER 13, 2019


FROM: ADMINISTRATIVE REMEDY COORDINATOR
      ALICEVILLE FCI

TO  : TERRI MCGUIRE MOLLICA, 31860-001
      ALICEVILLE FCI     UNT: CAMP D     QTR: D01-010U


THIS ACKNOWLEDGES THE RECEIPT OF THE ADMINISTRATIVE REMEDY REQUEST
IDENTIFIED BELOW:

REMEDY ID       : 1000103-F1
DATE RECEIVED   : DECEMBER 12, 2019
RESPONSE DUE    : JANUARY 1, 2020
SUBJECT 1       : MEDICAL CARE - DELAY OR ACCESS TO
SUBJECT 2       :

* Wed 1/29/2020 - Mr Johnson's open house.
  Said had to wait on an answer from
  "9" before file a "10".

* Wed 3/18/2020 - Mr Johnson's open house
  He e-mailed his supervisor. Said could not
  file "10" w/o answer on "9".

* Wed 3/25/2020 - Mr Johnson's open house →
  refused to give "10".

Exhibit F 2.4

## REQUEST FOR ADMINISTRATIVE REMEDY

**Administrative Remedy No. 1000103-F1**
**Part B - Response**

This is in response to your Request for Administrative Remedy No. 1000103-F1, received on December 12, 2019, wherein you state you have had pain in your lower abdomen, uterus, and ovaries since 2016.   You state you suffer heavy bleeding monthly, anemia, and regularly suffer an upset stomach.   You state you have addressed these issues at Sick Call without resolution. As relief, you would like to be seen by an outside specialist or surgeon to determine the best course of action, within the next thirty (30) days.

A review of your medical record and consultation with staff reveals you were evaluated by the physician and nurse practitioner at your chronic care clinic visit on November 25, 2019. Your prescription for Medroxyprogesterone was renewed at that time and new consult orders were placed for you to see an obstetrics/gynecology specialist and to receive an ultrasound.   Your chart shows you received the pelvic ultrasound on December 19, 2019.

A further review of your medical record confirms you have a scheduled appointment with an OB/GYN specialist.   Due to security considerations, you will not be told in advance of the date, time, or location of these appointments.

Accordingly, your Request for Administrative Remedy is for informational purposes only. **If you are dissatisfied with this response, you may appeal to the Regional Director at the Southeast Regional Office, 3800 Camp Creek Parkway, S.W., Building 2000, Atlanta, Georgia 30331.   Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.**

Katina Heckard, Acting Warden

6/23/00

Date

Exhibit F-3



**USPS TRACKING #**

9590 9402 5405 9189 0421 64

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

● Sender: Please print your name, address, and ZIP+4® in this box●

From: Terri Mollica # 31860-001
P.O. Box 487
Aliceville, AL 35442-0487

D

42-048787

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

Regional Director at the Southeast
Office
3800 Camp Creek PKWY SW
Building 2000
Atlanta, GA 30331

9590 9402 5405 9189 0421 64

2. Article Number (Transfer from service label)

7019 1640 0000 8596 2244

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

Recd 10/14/2020

A. Signature
X _____ ☐ Agent
                   ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery
                                    8-17-20

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ red Mail
☐ red Mail Restricted Delivery
  (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

Central Office Administrative Remedy Appeal

Exhibit F-4

Cert. Mail # 7020 0640 0000 8156 3314

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: __Mollica, Terri. M.__    __31860-001__    __D__    __Spc Aliceville__
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - REASON FOR APPEAL**

I Submitted my form 10 to Regional Office on 8/01/2020; it was sent certified (7019 1640 0000 8596 2244) and signed for on 8/17/2020. As of this date, I have not received an answer.

I have requested treatment for uterine/cervical/ovarian tumors for more than 4 years. Although I have seen 2 different gynecologists and had 4 ultrasounds and all have recommended surgery, Aliceville officials are denying medical care and interfering with treatment once it is prescribed.

I would like to be sent to a surgeon specializing in removal of transabdominal mesh and then have a hysterectomy and chemotherapy/radiation if required.

__10/01/2020__
DATE

_Terri McBrin Mollica_
SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_____
DATE

ORIGINAL: RETURN TO INMATE

**Part C - RECEIPT**

GENERAL COUNSEL

CASE NUMBER: __1000103-F1__

CASE NUMBER: __1000103·F1__

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____
DATE

SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

UPN LVN    PRINTED ON RECYCLED PAPER    BP-231(13)
JUNE 2002

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Federal Bureau of Prisons<br>Southeast Regional Office<br>3800 Camp Creek Pkwy, Bldg 2000<br>Atlanta, GA  30331 | Terri McGuire Mollica Reg No 31860-001<br>C/o SPC Aliceville<br>P.O. Box 487<br>Aliceville AL 35442-0487 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 5/14/1966 | Single | 7/28/2020 | 6:00 am |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

Claimant has been in U.S. Marshal or BoP custody since 5/2015. She has untreated uterine tumors and transabdominal mesh that needs to be removed, of which the SPC/FCI Aliceville staff is aware. On 7/28/2020, claimant fell off of the top bunk at FCI Aliceville (C-3 #210) and injured uterus causing bleeding and protrusion of mesh thru abdomen/pelvic area. The BoP is refusing to provide medical services.

9.                 PROPERTY DAMAGE

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

10.                PERSONAL INJURY/WRONGFUL DEATH

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Injury was caused by BoP officials deliberate indifference to Claimant's medical needs, especially refusing to have tumors/mesh surgically removed and requiring claimant to use a "top bunk" at the FCI Aliceville.

11.                WITNESSES

| NAME | ADDRESS (Number, Street, City, and Zip Code) |
|---|---|
| Dora Moreira | Same |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|  | $5.2 million |  |  |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| Terri McGuire Mollica | N/A | 8/01/2020 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable
95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance? ☐ Yes  If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. ☒ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes ☐ No | 17. If deductible, state amount.

N|A

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

N|A

19. Do you carry public liability and property damage insurance? ☐ Yes  If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code). ☒ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
  A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

**STANDARD FORM 95** REV. (2/2007) BACK

Exhibt G - 1.3



USPS TRACKING #

9590 9402 5405 9189 0421 64



First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States**
**Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

From: Terri Mollica # 31860.001

P.O. Box 487

Aliceville, AL 35442 - 0487

D

42-048787

COUNTY of Pickens

STATE of Alabama


## AFFIDAVIT


I, Terri McGuire-Mollica, the Plaintiff, respectfully aver the following:

- I am currently incarcerated at the Satellite Prison Camp in Aliceville, Alabama. Since approximately May 1, 2020, the officers/staff at this prison has been tampering with my legal mail and denying me access to the Courts, as follows:

A.    Withholding Mail, including Legal Mail, from me:

- 6/27/2020 - Copy of court filing mailed by family from Birmingham, AL;

- 7/07/2020 - 5 copies of the www.Reason.com magazine article (related to Aliceville's lack of healthcare) mailed by family from Birmingham, AL;

- 7/08/2020 - Deficiency notice from the U.S. Court of Appeals in Atlanta, GA (appeal #20-11452);

- 7/31/2020 - Notice of Dismissal from the U.S. Court of Appeals in Atlanta, GA  (appeal #20-11452);

- 8/04/2020 - 2 copies of form 2241 mailed from the U.S. District Court in Tuscaloosa, AL;

- 9/02/2020 - Copies of Medical Records from Walker's Women Clinic in Jasper, AL;

- 9/14/2020 - Copies of Legal Paperwork and Administrative Remedies to Regional Office, mailed by family in Birmingham, AL.


B.    Legal Mail sent by me but not received by the Courts:

- 5/17/2020 - Form mailed to the U.S. Court of Appeals in Atlanta, GA;

- 7/13/2020 - Form mailed to the U.S. Court of Appeals in Atlanta, GA;

- 9/07/2020 - Form 2241 and Brief mailed to the U.S. District Court in Birmingham, AL.


C.    Additional Mail not Received by Recipients:

- 7/19/2020 - Letter mailed to Senator Doug Jones in Huntsville, AL;

- 7/19/2020 - Letter mailed to the American Civil Liberties Union of Alabama, Montgomery, AL.

D.    Mail Not Received Timely by Plaintiff:

- 9/02/2020 - Medical Records sent from Dr. Ted Cox; received by Plaintiff on 9/23/2020;

- 8/17/2020 - Certified Mail Receipt signed for at FBoP Regional Office on 8/17/2020; given to Plaintiff on 10/14/2020.

E.    Warden

On 10/03/2020, Plaintiff notified the Warden of the problems with the mail and access to the court system. There has been no response or action to correct. (see Attachment H-3)

The preceding facts are true to the best of my recollection and I certify under penalty of perjury under the laws of the United States pursuant to Title 28 U.S.C. 1746.

Executed on this, the __7th__ day of October 2020.

Terri Mollica
Reg No. 31860-001
c/o SPC Aliceville
P.O. Box 487
Aliceville, AL  35442

The following witness certify by signing that: (1) they currently reside at the SPC in Aliceville, AL; (2) Terri McGuire-Mollica is personally known to them; and (3) she signed this document in their presence.

Name

Reg No. 20962043

Date 10/07/2020

Name

Reg No. 32265977

Date 10/7/2020

Name

Reg No. 35956081

Date 10-7-2020

Exhibit H.3

TRULINCS 31860001 - MOLLICA, TERRI MCGUIRE - Unit: ALI-D-D

--------------------------------------------------------------------------------------------------

FROM: 31860001
TO: Warden
SUBJECT: ***Request to Staff*** MOLLICA, TERRI, Reg# 31860001, ALI-D-D
DATE: 10/03/2020 11:31:11 AM

To: Mr. Garrett
Inmate Work Assignment: Rec

Hi Warden Garrett.

You may or may not be aware, but the mail room is "at least 3 weeks behind" on distributing mail (per the mailroom officer).

In July 2020, I had 2 pieces of mail from the Appeals Court in Atlanta "lost" once it arrived here. That court sends its order certified and have to be signed for by the staff here as well as by me. They simply choose not to give me that mail and my appeal was dismissed. Luckily, the law clerk at that court helped me reinstate it.

However, the District Court in Birmingham does NOT send its mail certified. I was mailed an order on 9/9/2020 and another one on 9/15/2020 from Birmingham. I have not received either of these orders.

These are time sensitive and I need them to respond to the order.

I received a piece of mail on 9/23 that was post-marked 9/02. There's no excuse why it takes 21 days to distribute mail here.

By holding my legal mail from the court, Aliceville is violating my 5th Amendment rights to have access to the courts.

I would ask that you please instruct that mailroom staff to find my legal mail that has been at this facility for more than 3 weeks. I have already spoken to the mail room clerks and they are not inclined to help me.

Thank you for your help in this matter.